**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| ANIQA RAIHAN<br><br>    Plaintiff,<br><br>v.<br><br>GEORGE WASHINGTON UNIVERSITY<br>2121 Eye Street, N.W.<br>Washington, D.C. 20052<br><br><u>Serve on Registered Agent</u>:<br>Mary Lynn Reed, Esq.<br>2100 Pennsylvania Avenue, N.W.<br>Suite 250<br>Washington, D.C.  20052<br><br>    Defendant. | CIVIL ACTION NO. 1:18-cv-994<br><br><br><br>**JURY TRIAL DEMANDED** |

**COMPLAINT AND JURY DEMAND**

Plaintiff, through her attorneys, submits this Complaint and states the following:

**INTRODUCTION**

1. This is an action for money damages, injunctive relief, costs, attorney's fees, and other relief as a result of Defendant's discrimination on the basis of gender.

2. Plaintiff brings this action under 20 U.S.C. § 1681, commonly referred to as Title IX.

**PARTIES**

3. Plaintiff Aniqa Raihan ("Plaintiff") was at all times relevant to this Complaint, a student at Defendant George Washington University.

4. Defendant George Washington University ("GW"), is a university located in Washington, DC.

**JURISDICTION**

5. GW receives federal financial assistance and is therefore subject to the dictates of 20 U.S.C. § 1681. ("Title IX")

6. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §

1331 and over state law claims pursuant to 28 U.S.C. § 1367. Venue in this Court is proper under 28 U.S.C. § 1391 (b) because the events giving rise to this claim took place in this judicial district, and the Defendant resides in this judicial district.

## GW's POLICIES AND PROCEDURES

7. During the time of the allegations herein, GW maintained a Sexual Harassment and Sexual Violence Policy ("Policy"). The Policy was to be used whenever a student reported an incident of sexual misconduct.

8. The Policy provided that in the event sexual harassment occurred, GW would "…respond firmly and fairly, and in a timely manner."

9. The Policy required that GW provide victims of sexual violence with, "…written notice about existing counseling, health, mental health, victim advocacy, legal assistance, visa and immigration assistance, student financial aid and other services," as well as other academic accommodations.

10. The Policy provided that GW "…take interim action while incidents involving allegations of sexual harassment, including sexual violence are investigated and resolved, as appropriate." "Interim action may be taken regardless of whether an individual chooses to report an incident to campus police or local law enforcement, and may include interim suspension, removal from university housing, 'no contact orders,' and/or changing academic, living, transportation or working arrangements for one or more parties." The Policy explained that "[f]urther information about potential interim actions is available from" GW's Title IX Coordinator, GW's Division of Student Affairs, and the GW Equal Employment Opportunity/Employee Relations Office.

11. The Policy explained, "During consultation, the person who alleges sexual harassment will be provided with a copy of the university's Sexual Harassment and Sexual Violence Policy and Procedures, have an opportunity to ask questions, and obtain information about reporting incidents, filing criminal charges, obtaining

interim relief, seeking disciplinary action, and obtaining counseling, victim advocacy, legal assistance, health and mental health assistance and other services on campus and in the community."

12. With respect to sanctions, the Policy stated, "In cases involving suspension or expulsion, the Vice Provost and Dean of Student Affairs, in concurrence with the Provost and Executive Vice President for Academic Affairs, will impose sanctions." "The university may impose interim corrective action at any time, if doing so reasonably appears required to protect a member of the university community."

13. Once a formal investigation is initiated, the Policy states that disciplinary proceedings should be completed within 45 days.

14. GW also maintained a Code of Student Conduct ("Code of Conduct") which governed student discipline generally. The Policy explicitly stated that in the event there was a conflict between the Code of Conduct and the Policy in a case of sexual misconduct, the Policy would govern.

15. During the time of the allegations alleged herein, Gabriel Slifka ("Slifka") was the Director of GW's Office of Student Rights and Responsibilities ("OSRR"). Rory Muhammad ("Muhammad") was GW's Title IX Coordinator.

**GW'S SEXUALLY HOSTILE CULTURE AND HISTORY OF INDIFFERENCE TO SEXUAL MISCONDUCT**

16. GW has a history of failing to respond reasonably to reports of sexual misconduct on campus.

17. In 2011, Federal investigators from the Department of Education ("DOE") opened an investigation into GW for failing to respond adequately to reports of sexual misconduct on campus.

18. On August 31, 2011, GW and the DOE entered into a resolution agreement settling the DOE's investigation into GW for violation of Title IX. As part of the resolution

agreement, GW was required to adopt new policies and procedures for specifically responding to reports of sexual misconduct that were separate and distinct from the policies and procedures for responding to other potential violations not involving sexual misconduct.

19. Plaintiff is informed, believes, and on that basis alleges that in violation of its agreement to process sexual misconduct complaints under a specific sexual misconduct policy, GW consistently processed, and continues to process, complaints of sexual misconduct using the general policies for responding to student misconduct.

20. In 2012, then Vice Provost for Diversity and Inclusion and Title IX Coordinator Terri Harris Reed explicitly acknowledged that GW was evaluating its Title IX policies to assess compliance with federal guidelines promulgated by the Department of Education's Office for Civil Rights in the Dear Colleague Letter of 2011 ("DCL").

21. In 2014, GW published a Climate Survey regarding sexual misconduct on campus. The survey revealed that in 2014, approximately one-in-five (22%) undergraduate students had experienced unwanted sexual behavior on campus. Approximately one-in-three (36%) upper-class females experienced unwanted sexual behavior. The survey also revealed that 60% of undergraduate students did not agree that GW was effective at creating a climate free from unwanted sexual behavior, and 64% of undergraduate students felt GW should have done more to raise awareness about sexual harassment issues. Further, among those who had experienced sexual misconduct only 10% reported their experiences. Of those that reported, approximately one-in-three (35%) reported that GW's response to their report was inadequate, and only 17% reported that GW responded adequately.

22. In August of 2017, the DOE initiated yet another investigation into GW's handling of reports of sexual misconduct on campus. That investigation remains pending.

**PLAINTIFF'S SEXUAL ASSAULT AND GW'S DELIBERATE INDIFFERENCE**

23. Plaintiff enrolled as an undergraduate student GW in the fall of 2013.

24. During Plaintiff's freshman year at GW in 2014, she was sexually assaulted by another now-former student, Mark Favorito "Favorito".

25. On or around March 6, 2014, Plaintiff and her friends were in Plaintiff's dorm room playing games and drinking alcohol.

26. Favorito arrived later in the evening and witnessed Plaintiff drinking, as well as her state of intoxication.

27. At some time in the night, Plaintiff's roommate came home and asked the group to disperse.

28. Favorito invited Plaintiff to his residence hall room.

29. While in Favorito's room, Plaintiff started to feel dizzy.

30. Favorito recommended that Plaintiff rest on his bed while he packed his suitcase to prepare to leave to Spring Break the next day.

31. Plaintiff and Favorito started to watch a video on Netflix together. Eventually, Favorito sat down next to Plaintiff on the bed.

32. Favorito attempted to kiss Plaintiff, but Plaintiff turned away and initiated a discussion about Favorito's relationship with his then current girlfriend.

33. Plaintiff also tried to push Favorito away from her.

34. During this time frame, Plaintiff recalls going in and out of consciousness before blacking out. Before blacking out, Plaintiff remembers Favorito engaging in sexual activity with her that she did not consent to.

35. After that point, Plaintiff doesn't recall the remainder of her interaction with Favorito that evening.

36. The next morning, Plaintiff woke up and immediately left Favorito's residence hall room.

37. Plaintiff did not give consent to any type of sexual activity with Favorito.

38. The process of filing a Title IX complaint with GW's Title IX office was confusing and unclear.

39. Plaintiff met first with Carrie Ross ("Ross"), GW's then assistant Title IX Coordinator to explore her options for filing a report against Favorito. Ross explained Plaintiff's options and set up a meeting between Plaintiff and Jennifer Alexander-Smith ("Alexander-Smith"), the Assistant Director of the OSRR. Soon after Plaintiff's meeting, Ross left GW. Upon Ross' departure, GW only maintained a single administrator for the Title IX office which oversaw over 26,000 students.

40. Because, based on information and belief, GW processes all reports of sexual violence through the OSRR and not through Title IX, Plaintiff then met with Jennifer Alexander-Smith ("Alexander-Smith"), the Assistant Director of the OSRR. During this meeting, Alexander-Smith explained that once a formal complaint is filed, GW issues a no-contact order to the alleged perpetrator.

41. Plaintiff is informed, believes, and on that basis alleges that GW never issued a no-contact order to Favorito.

42. This move from the Title IX office to OSRR was significant as each office maintained distinct policies and procedures for responding to complaints. The Title IX Office used the Policy, which specifically addresses reports of sexual misconduct; whereas, OSRR used the Code of Student Conduct which addresses student misconduct generally.

43. Plaintiff is informed, believes, and on that basis alleges, that GW purposely reroutes Title IX complaints to OSRR so that the Code of Student Conduct is applied instead of the Policy.

44. On October 3, 2016, Plaintiff submitted a formal complaint to GW against Favorito.

45. On November 9, 2016, Plaintiff met with Slifka, the Director of the OSRR. At this meeting, Slifka and Plaintiff discussed the code of student conduct and how it would apply to Plaintiff's complaint.

46. Following a brief investigation, OSRR initiated a formal hearing on December 19, 2016. Following a full hearing, the hearing panel concluded that Favorito had

engaged in "Sexual Misconduct – (1) Sexual Violence," and recommended a sanction of suspension.

47. Plaintiff was not immediately made aware of the result of the hearing, or if any sanction had been issued.

48. On February 6, 2017, approximately two months after the hearing took place, Plaintiff emailed Alexander-Smith, requesting the results of the hearing and an update regarding any sanction that had been issued. Alexander-Smith did not respond to Plaintiff's e-mail.

49. On February 8, 2017, Plaintiff again e-mailed Alexander-Smith requesting the results of the hearing and an update regarding any sanction that had been issued. This time, Alexander-Smith responded that she had no update because the claim was still under review.

50. On March 7, 2017, approximately three months after the hearing took place, and having not heard from anyone at GW, Plaintiff again e-mailed Alexander-Smith requesting an update. Alexander-Smith did not respond to Plaintiff's e-mail.

51. On March 15, 2017, Plaintiff again e-mailed Alexander-Smith requesting an update. Plaintiff stated, "It's now been well over half a semester since my hearing and I have yet to hear back regarding a decision. My rapist is a few short weeks from graduating and quite possibly entering the world of victim services, where he will undoubtedly go onto to violate other women. This experience has been the antithesis of the feminist, liberal bastion that GW claims to be… I would appreciate an answer regarding the status of my case and when I can expect a decision." Alexander-Smith responded that the claim was still under review.

52. On March 22, 2017, Plaintiff called the OSRR to express her dissatisfaction with the way her claim was being handled and that GW may be in violation of Title IX in its response to her complaint.

53. Plaintiff is informed, believes, and on that basis alleges, that GW consistently delays

in investigating and adjudicating reports of sexual misconduct. GW also consistently fails to communicate with students who file reports of sexual misconduct, including failing to provide timely updates to claimants.

54. On March 24, 2017, Slifka e-mailed Plaintiff an official outcome letter and adjudication report. This e-mail was sent to Plaintff 172 days after she filed her complaint, and over 90 days after a formal hearing was held resulting in a recommended sanction of suspension.

55. Plaintiff is informed, believes, and on that basis alleges that Slifka told at least one other GW student that GW typically levies a sanction of a three-year suspension for sexual assault.

56. Despite the hearing panel recommending a sanction of suspension, and the Code of Student Conduct recommending a minimum sanction of one year suspension for committing sexual violence, Favorito was given a sanction of "deferred suspension." Because Favorito was graduating at the end of the semester, the practical effect of a deferred suspension was that Favorito would still be allowed to complete his coursework, graduate on time, and serve his "suspension" after he had already graduated.

57. Slifka's letter explained that because the complaint was processed under the Code of Student Conduct, Plaintiff was given 5 days to appeal, and could only appeal the finding of the hearing panel and not the sanction.

58. Given the constraints on her ability to appeal, Plaintiff did not appeal, and Slifka e-mailed Plaintiff to finalize GW's decision on March 31, 2017.

59. On April 2, 2017, Plaintiff went public with a Change.org petition. Her petition explicitly called for Favorito to be expelled and that he be terminated from his employment at the student health center. It also called for Slifka's removal as the Director of OSRR. In addition, the petition called for several policy changes, including:

- Mandatory suspensions for those found guilty of sexual violence;
- Weekly status updates for survivors who have filed a complaint;
- A two-month deadline for adjudicating reports of sexual misconduct;
- Allowing survivors to appeal both the outcome of a complaint, and the sanction issued.

60. Although Plaintiff's petition received thousands of signatures, GW did not fulfill any of the petition's demands.

61. On April 7, 2017, Plaintiff called OSRR and spoke to Slifka regarding her claim. She asked why Favorito was not given the recommended sanction of a suspension. Slifka admitted that he had suggested the lesser sanction and that GW Dean Peter Konwerski ultimately approved it.

62. Also on April 7, 2017, Plaintiff and GW Students Against Sexual Assault ("SASA") launched an email campaign to have Favorito fired from his position as a manager at the on-campus gym. Though Favorito was never fired, over 100 students joined the campaign and eventually, certain restrictions were placed on Favorito.

63. Favorito consistently, and flagrantly violated the restrictions placed on him at his place of employment and harassed female employees that had spoken up against him. Favorito's harassment of these female employees was so severe that several left their jobs. Plaintiff is informed, believes, and on that basis alleges that Favorito was never disciplined for violating the restrictions placed on him or for harassing female employees.

64. Plaintiff is informed, believes, and on that basis alleges, that Slifka had no involvement whatsoever in the resolution of Plaintiff's claim up until that point. Plaintiff had only met with Slifka one time before to discuss the disciplinary process, and no details about her report were discussed. Slifka was not present at her hearing, and Plaintiff is informed, believes, and on that basis alleges that he was not involved in any investigation of Plaintiff's claim. Nonetheless, Slifka recommended a lesser

sanction than the hearing panel recommended.

65. On multiple occasions, Plaintiff attempted to speak with GW administrators to understand the process by which a complaint was processed. She was consistently given false information, including that the hearing panel deliberates a first time and submits an adjudication report. The hearing panel then deliberates a second time, and after the second round of deliberations, an official from the OSRR conveys the panel's decision to Slifka who ultimately decides on a sanction.

66. This process, as described to Plaintiff explicitly contradicted the process as described in GW's Code of Student Conduct.

67. Plaintiff is informed, believes, and on that basis alleges, that GW created an elaborate lie about the adjudication process of Plaintiff's complaint in order to cover up Slifka's decision to impose a de-facto non-sanction on Favorito.

68. Because GW used the Code of Student conduct to adjudicate Plaintiff's complaint, which contained strict appeals procedures, GW would not consider additional substantive information related to Plaintiff's complaint after the appellate deadline.

69. Specifically, Plaintiff reported that Favorito raped, or attempted to rape three other GW female students, in addition to Plaintiff. Given this additional information, Plaintiff urged GW to immediately suspend Favorito and conduct an investigation into these three additional complaints.

70. Plaintiff is informed, believes, and on that basis alleges that GW never investigated these three additional reports of sexual violence committed by Favorito.

71. Throughout the entirety of the investigation and adjudication process, GW did not implement any interim safety measures to protect Plaintiff from Favorito on campus. As a result, Plaintiff was constantly exposed to a sexually hostile environment on campus.

72. After the adjudication of her report, Plaintiff did, in fact, encounter Favorito on campus at the school gym where Favorito was employed. Because Favorito was

employed at the school gym, and because GW made no effort to prevent Plainitff's interaction with Favorito, Plaintiff was effectively denied access to the school gym.

73. On May 1, 2017, GW's student government unanimously passed the Aniqa Raihan Act, endorsing the demands of Plaintiff's petition and calling on GW to expel Favorito.

74. On May 20, 2017, Favorito graduated, along with Plaintiff, despite having been found guilty of raping Plaintiff.

75. During the graduation ceremony, on May 20, 2017, several student activists and Plaintiff dropped a banner reading "GW PROTECTS RAPISTS" when Favorito's name was called. University Police threatened to arrest them and told them that they would not protect them if anyone tried to physically harm them as a result of their protest.

76. Based on information and belief, in addition to Favorito, GW has allowed at least one other student to graduate who was found by GW to have committed sexual assault.

77. On June 2, 2017, Plaintiff met with Toi Carter ("Carter"), GW's general counsel/Head Counsel, Provost Forrest Maltzman ("Maltzman"), and the Director and Vice Provost for Diversity, Equity and Community Engagement, Caroline Laguerre-Brown ("Laguerre-Brown"), who oversees the Title IX office. During this meeting, these GW administrators promised to investigate the disparity between the adjudication report's sanction recommendation (suspension) and Favorito's actual sanction (deferred suspension). They also agreed to investigate the lies Konwerski told Plaintiff about the hearing board process. To date, Plaintiff has not been notified of any result of any such investigation or if any investigation was ever initiated.

**COUNT ONE**
**Discrimination Under Title IX: Sexually Hostile Culture**
**(Violation of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681(a))**

78. Plaintiff incorporates all paragraphs of this Complaint as if fully set forth herein.

79. GW actively created and was deliberately indifferent to a culture of sexual hostility and violence within its institution by instituting several de-facto policies and permitting practices that included but are not limited to:

    i. Little to no meaningful discipline of students who committed acts of sexual misconduct;

    ii. Interference with female students' access to Title IX resources and rights;

    iii. Not reporting incidents of sexual misconduct to the appropriate campus offices;

    iv. Failing to comply with its own policies, as well as its significant departure from the DCL, Questions and Answers, and other federal guidance,

80. GW's sexually hostile policies and practices were a proximate cause of Plaintiff being subjected to sexual harassment in the form of 1) sexual assault by Favorito, another GW student, 2) a hostile educational environment, 3) and ongoing harassment by forcing her to be vulnerable to additional potential harassment by her assailant, also a student of GW.

81. GW's indifferent policies and practices amounted to an intentional violation of Title IX.

82. GWs intentional violations of Title IX, and failure to take meaningful remedial measures in response to the actual knowledge of the prevalence of sexual misconduct on campus amounted to a policy of deliberate indifference to sexual misconduct against female students and created a sexually hostile environment for Plaintiff and other female student victim(s) of sexual misconduct.

83. GW's deliberate indifference, and willful and wanton behavior, created a danger of and increased the risk of harm to Plaintiff by sexual abuse and/or sexual harassment.

84. The sexual harassment that Plaintiff suffered was so severe, pervasive, and objectively offensive that it effectively barred her access to educational opportunities and benefits provided by GW.

85. As a direct and proximate result of GW's creation of and deliberate indifference to its sexually hostile educational environment, Plaintiff suffered damages and injuries for which GW is liable.

### COUNT TWO
### Gender Discrimination Under Title IX
### Deliberate Indifference to Plaintiff's Sexual Assault

86. Plaintiff incorporates all paragraphs of this Complaint as if fully set forth herein.

87. By October 3, 2016, GW received actual notice of the sexual assault committed by Favorito, against Plaintiff, while Plaintiff and Favorito were students at GW.

88. GW failed to provide a prompt and equitable resolution to Plaintiff.

89. GW's failure to provide a prompt and equitable resolution to Plaintiff was clearly unreasonable and amounted to deliberate indifference to Plaintiff's sexual assaults.

90. GW's failure to comply with its own policies, as well as its significant departure from the DCL, Questions and Answers, and other federal guidance, in its response to Plaintiff's report of sexual assault was clearly unreasonable and amounted to deliberate indifference to Plaintiff's sexual assault.

91. GW's deliberate indifference to Plaintiff's sexual assault exposed her to the risk of continued sexual harassment, which was so severe, pervasive, and objectively offensive that it effectively barred her access to educational opportunities and benefits including academics, and on campus events and activities provided by GW.

92. As a direct and proximate result of GW's deliberate indifference to Plaintiff's sexual assault, Plaintiff suffered damages and injuries for which GW is liable.

### COUNT THREE
### Negligent Retention

93. Plaintiff incorporates all paragraphs of this Complaint as if fully set forth herein.

94. An employer breaches a duty to a plaintiff to use reasonable care in the retention of an employee which proximately caused harm to the plaintiff if that employer knew or should have known its employee behaved in a dangerous or otherwise incompetent manner and the employer failed to adequately supervise the employee.

95. Slifka was, at all times relevant, an employee of GW.

96. Mr. Slifka proximately caused harm to Plaintiff by treating her with callous disregard and by failing to investigate and address sexual harassment.

97. Upon information and belief, Mr. Slifka had previously caused harm to other sexual harassment victims in a similar manner.

98. Upon information and belief, before Plaintiff's report, other sexual harassment victims have made GW aware of the harm Mr. Slifka had inflicted upon them.

99. GW failed to take adequate measures to ensure that Mr. Slifka followed written university procedures and ensure Mr. Slifka did not aggravate the harm suffered by sexual harassment victims.

100. GW negligently retained Mr. Slifka and therefore caused harm to Plaintiff.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff seeks a judgment against GW as follows:

A. An award of damages in an amount to be established at trial, including, without limitation, payment of Plaintiff's expenses incurred as a consequence of the sexual assault; damages for deprivation of equal access to the educational benefits and opportunities provided by GW; and damages for past, present, and future emotional and physical pain and suffering, ongoing and severe mental anguish, and loss of past, present, and future enjoyment of life as a result of being sexually harassed;

B. An award of pre- and post-judgment interest;

C. An award of costs and attorney fees, pursuant to 42 U.S.C. § 1988(b);

D. Punitive Damages; and

E. Such other relief as is proper.

Respectfully submitted,

STRAVITZ LAW FIRM, PC

By: s/ Eric N. Stravitz
Eric N. Stravitz (Unified Bar No. 438093)
4300 Forbes Boulevard
Suite 100
Lanham, MD 20706
O: (240) 467-5741
F: (240) 467-5743
E: eric@stravitzlawfirm.com
*Counsel for Plaintiff*

OF COUNSEL
Alex S. Zalkin, Esq.
The Zalkin Law Firm, P.C.
12555 High Bluff Drive
Suite 301
San Diego, CA 92130
O: 858-259-3011
E: alex@zalkin.com

## JURY DEMAND

Plaintiff demands a jury trial on all issues so triable.

s/ Eric N. Stravitz
Eric N. Stravitz (Unified Bar No. 438093)