UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **ANIQA RAIHAN**, | |
| Plaintiff, | |
| v. | Case No. 1:18-cv-00994 (TNM) |
| **THE GEORGE WASHINGTON UNIVERSITY**, | |
| Defendant. | |

## MEMORANDUM OPINION

Plaintiff Aniqa Raihan brings this suit against her alma mater, George Washington University, alleging that the University violated the law in the way its policies dealt with sexual harassment generally, and her own sexual assault particularly. The Supreme Court has interpreted Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681-1688, to authorize damages against federally funded schools even for student-on-student harassment, but the bar is high. Schools are liable "only where the funding recipient acts with deliberate indifference to known acts of harassment in its programs or activities," and "only for harassment that is so severe, pervasive, and objectively offensive that it effectively bars the victim's access to an educational opportunity or benefit." *Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 633 (1999). Ms. Raihan's Complaint does not clear that bar.

The Complaint does not point to facts from which the Court could plausibly infer that official school policy caused Ms. Raihan's sexual assault. And the University's response—even if the Court assumes that it constituted deliberate indifference—did not deprive Ms. Raihan of educational benefits in the way *Davis* contemplates, where the only specific educational harm she claims was seeing her assailant at the gym once and being forced to avoid the gym in the

weeks before her graduation. Ms. Raihan also asserts that the University negligently retained the Director of the Office of Student Rights and Responsibilities, but this claim fails under District of Columbia tort law. The Court will grant the University's Motion to Dismiss.[1]

### I. BACKGROUND

These facts come from Ms. Raihan's Complaint. At this stage, the Court accepts a plaintiff's well-pleaded allegations as true. *Banneker Ventures, LLC v. Graham*, 798 F.3d 1119, 1129 (D.C. Cir. 2015).

Ms. Raihan's allegations tread a tragically common path. During the spring of Ms. Raihan's freshman year, in March 2014, Ms. Raihan and her friends were drinking alcohol in her dorm room. Compl. ¶¶ 24-25. Another freshman, Mark Favorito, arrived and observed Ms. Raihan's intoxication. *Id.* ¶ 26. When Ms. Raihan's roommate asked the group to leave, Mr. Favorito invited Ms. Raihan to his room, where she began to feel dizzy. *Id.* ¶¶ 27-29. Ms. Raihan sat on Mr. Favorito's bed, and the two watched Netflix together. *Id.* ¶¶ 30-31. She declined his efforts to kiss her by turning away, starting a conversation about Mr. Favorito's girlfriend, and pushing Mr. Favorito away. *Id.* ¶¶ 32-33. Ms. Raihan began "going in and out of consciousness before blacking out. Before blacking out, [she] remembers [Mr.] Favorito engaging in sexual activity with her," to which she did not consent. *Id.* ¶ 34. In fact, Ms. Raihan "did not give consent to any type of sexual activity." *Id.* ¶ 37.

Later, on an unspecified date, Ms. Raihan met with the University's Assistant Title IX Coordinator Carrie Ross, "to explore her options for filing a report against [Mr.] Favorito." *Id.* ¶ 39. Ms. Ross "explained Plaintiff's options," and arranged a meeting between Ms. Raihan and

---

[1] This Court has original jurisdiction over the federal claims under 28 U.S.C. § 1331 and supplemental jurisdiction for the related District of Columbia claim under 28 U.S.C. § 1367.

2

Jennifer Alexander-Smith, the Assistant Director of the Office of Student Rights and Responsibilities (OSRR). *Id.* "Soon" after, Ms. Ross left the University, leaving only a single coordinator for the school's Title IX program. *Id.* Ms. Raihan then met with Ms. Alexander-Smith, who told her that "once a formal complaint is filed, GW issues a no-contact order to the alleged perpetrator." *Id.* ¶ 40. Ms. Raihan finally filed a formal complaint on October 3, 2016, two and a half years after the alleged incident. *Id.* ¶ 44.

Ms. Raihan's complaint was processed by OSRR, and in fact the University "processes all reports of sexual violence through the OSRR and not through [the] Title IX [Office]." *Id.* ¶¶ 40, 43. Ms. Raihan claims that this makes a significant difference. OSRR uses the Code of Student Conduct as the guide for adjudicating such reports, while the Title IX Office would use the Sexual Harassment and Sexual Violence Policy, *id.*, even though the Policy explicitly states that it takes precedence in sexual misconduct cases. *Id.* ¶ 14.

The Complaint provides little detail about the Code of Student Conduct, but it lists several salient features of the Policy. The Policy provides that the University will "take interim action . . . as appropriate" while sexual harassment claims are being investigated, whenever "doing so reasonably appears required to protect a member of the university community." *Id.* ¶ 10, 12. The Policy also sets a 45-day target for completing disciplinary proceedings after a formal investigation begins, and states that the "Vice Provost and Dean of Student Affairs, in concurrence with the Provost and Executive Vice President for Academic Affairs," are responsible for imposing suspension and expulsion sanctions. *Id.* ¶¶ 12-13.

The University's failure to use the Title IX Office and the appropriate sexual misconduct policy is one of several structural problems that Ms. Raihan identifies. She asserts the University "has a history" of failures in this area, which in 2011 prompted the U.S. Department of

3

Education to investigate the University "for failing to respond adequately to reports of sexual misconduct on campus." *Id.* ¶¶ 16-17. The investigation led to an August 2011 resolution agreement, under which the University was supposed to "adopt new policies and procedures" for the specific context of sexual misconduct reports. *Id.* ¶ 18. Ms. Raihan also points to the University's 2014 Climate Survey, which revealed, among other things, that 36% of "upper-class females [had] experienced unwanted sexual behavior;" 60% of undergraduate students did not think the University "was effective at creating a climate free from [such] behavior;" and 35% of the few who reported sexual misconduct said the official response was inadequate. *Id.* ¶ 21.

In August 2017, the U.S. Department of Education launched another investigation into the University's approach to sexual misconduct, with results still pending. *Id.* ¶ 22. Ms. Raihan, for one, says that the adjudication process is confusing, and that she often received misleading or contradictory information. *Id.* ¶¶ 38, 65-66. For example, Ms. Raihan was told that the hearing panel meets first to deliberate and submit an adjudication report, and a second time to deliberate on a recommended sanction, with Gabriel Slifka, the Director of OSRR, making the ultimate decision—a process she claims "contradicted the process described in [the University's] Code of Student Conduct." *Id.* ¶¶ 65-66.

Despite Ms. Raihan's 31-month delay in filing her formal complaint, the University conducted fact-finding quickly. About a month after Ms. Raihan filed her complaint, she met with Director Slifka, and discussed the Code of Student Conduct and how it would apply to the complaint. *Id*. ¶ 45. OSRR investigated the claim, then held a formal hearing in December 2016. *Id*. ¶ 46. The hearing panel found that Mr. Favorito had committed "Sexual Misconduct – (1) Sexual Violence," and recommended suspension as the appropriate sanction. *Id.* The Code of Student Conduct endorses "a minimum sanction of one-year suspension for committing sexual

violence." Compl. ¶ 56. In February and March 2017, Ms. Raihan repeatedly reached out to Ms. Alexander-Smith at OSRR to ask what the hearing panel had concluded and whether any sanction had issued. *Id*. ¶¶ 48-51. Each time, Ms. Alexander-Smith either did not respond, or said that the claim was "under review." *Id*.

On March 24, 2017, Director Slifka emailed Ms. Raihan an official outcome letter and adjudication report, which informed Ms. Raihan that Mr. Favorito would receive a "deferred suspension." *Id*. ¶¶ 54, 56. He never received a no-contact order. *Id*. ¶ 41. "Because [Mr.] Favorito was graduating at the end of the semester, the practical effect of a deferred suspension was that [he] would still be allowed to complete his coursework, graduate on time, and serve his 'suspension' after he had already graduated." *Id*. ¶ 56. Director Slifka told Ms. Raihan that Mr. Favorito did not receive the suspension recommended by the hearing panel, because Director Slifka recommended a deferred suspension, and University Dean Peter Konwerski approved the deferral. *Id*. ¶ 61. Under the Code of Student Conduct, Ms. Raihan had five days to appeal, but she could only challenge the hearing panel's finding—not the sanction. She did not appeal, and the University's decision became final seven days later. *Id*. ¶ 58.

Ms. Raihan then "went public with a Change.org petition," calling for the University to expel Mr. Favorito and remove him from his job at the student health center. *Id*. ¶ 59. She also called for Director Slifka's removal and for several policy changes to the University's handling of sexual misconduct allegations. *Id*. Along with GW Students Against Sexual Assault, Ms. Raihan organized an "email campaign" to persuade the University to fire Mr. Favorito from his managerial position at the campus gym. *Id*. ¶ 61. Although "certain restrictions were placed on [Mr.] Favorito" at the gym, he often violated those restrictions, harassing female employees who "had spoken up against him," and causing several to leave their jobs. *Id*. ¶¶ 62-63. Ms. Raihan

5

also "reported that [Mr.] Favorito raped, or attempted to rape three other GW female students," urging the University to "immediately suspend" Mr. Favorito and investigate these additional claims. *Id*. ¶¶ 68-69. The University did not do so. *Id*. ¶¶ 70-71.

"Throughout the entirety of the investigation and adjudication process, [the University] did not implement any interim safety measures to protect Plaintiff from [Mr.] Favorito on campus." *Id*. ¶ 71. After the University's decision, Ms. Raihan encountered Mr. Favorito once at the school gym where he worked, and his employment there allegedly "effectively denied [her] access" to that facility. *Id*. ¶ 72. In May 2017, both Ms. Raihan and Mr. Favorito graduated. *Id*. ¶ 74.

Ms. Raihan sued in April 2018, seeking damages, costs, and attorneys' fees. Compl. 14-15. The University soon moved to dismiss. Mot. Dismiss, ECF No. 6.

## II. LEGAL STANDARDS

To avoid dismissal under Fed. R. Civ. P. 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim crosses from conceivable to plausible when it contains factual allegations that, if proved, would 'allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Banneker Ventures,* 798 F.3d at 1129 (alteration omitted) (quoting *Iqbal*, 556 U.S. at 678). A court must "draw all reasonable inferences from those allegations in the plaintiff's favor," but not "assume the truth of legal conclusions." *Id*. "In determining whether a complaint fails to state a claim, [a court] may consider only the facts alleged in the complaint, any documents either attached to or incorporated in the complaint and matters of

which [a court] may take judicial notice." *EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997).

Title IX provides that "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681 (containing some exceptions that do not apply here). Under this statute, the Supreme Court has authorized private lawsuits for money damages against schools, for failure to respond adequately to student-on-student harassment. *Davis*, 526 U.S. at 633.

Because Title IX draws its authority from the Constitution's Spending Clause, schools must have "adequate notice that they could be liable for the conduct at issue," or else "engage[] in intentional conduct that violates the clear terms of the statute." *Id*. at 640, 642. "[L]egislation enacted pursuant to the spending power is much in the nature of a contract: in return for federal funds, the States agree to comply with federally imposed conditions. The legitimacy of Congress' power . . . thus rests on whether the State voluntarily and knowingly accepts the terms." *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981). On this basis, *Davis* placed significant limits on Title IX liability for student-on-student harassment.

First, because "a recipient of federal funds may be liable in damages under Title IX only for its own misconduct," *Davis*, 526 U.S. at 640, in "circumstances wherein the recipient exercises substantial control over both the harasser and the context," *id.* at 645, schools can only be liable for "deliberate indifference to known acts of peer sexual harassment." *Id.* at 648. Deliberate indifference means that "the recipient's response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances." *Id*. *Davis* emphasized that this is no "mere 'reasonableness' standard"—making every case an exercise in fact-finding appropriate for

7

juries—but a heightened standard that courts in appropriate cases should decide "as a matter of law." *Id*. at 648-649. The standard "does not mean that recipients can avoid liability only by purging their schools of actionable peer harassment," and courts must "refrain from second-guessing the disciplinary decisions made by school administrators." *Id.* at 646. Instead, "[s]chool administrators will continue to enjoy the flexibility they require so long as funding recipients are deemed 'deliberately indifferent' to acts of student-on-student harassment only where the recipient's response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances." *Id*. at 649.

Second, given Title IX's focus on equal access to educational opportunities for both sexes, and discrimination in that context, the Court also held that "funding recipients are properly held liable . . . only where they are deliberately indifferent to sexual harassment . . . that is so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school." *Id*. at 650. Peer harassment, the Court explained, is not as likely as teacher-student harassment to have the "systemic effect" on educational access necessary to create liability, especially if there is only one incident of harassment. *Id.* at 652-53,

In sum, a school can be liable under Title IX for peer sexual harassment, but only if it "acts with deliberate indifference to known . . . harassment in its programs or activities . . . so severe, pervasive, and objectively offensive that it effectively bars the victim's access to an educational opportunity or benefit." *Id*. at 633. Courts are to rigorously police this line, including on motions to dismiss, when a school's response does not violate the legal standard. *Id*. at 649.

## III. ANALYSIS

### A. Ms. Raihan's Pre-Assault Claim Fails

Ms. Raihan's first count asserts that the University "actively created and was deliberately indifferent to a culture of sexual hostility and violence," thereby proximately causing her assault and later vulnerability. Compl. ¶¶ 78-85. In this claim, Ms. Raihan tries to hold the University responsible for the assault itself. *Id*. The Complaint mentions no specific cases—other than her's—that she believes the University mishandled. Instead, she argues that the University has "an official policy of indifference to sexual misconduct," Opp. 5, ECF No. 7, which "amounted to an intentional violation of Title IX." Compl. ¶ 81. This fact, she claims, allows her to avoid the requirement that schools are only liable for "sexual harassment[] of which they have actual knowledge." *Davis*, 526 U.S. 629, 650 (1999); Opp. 3.

The Supreme Court has said that if a school intentionally violates Title IX's plain terms, perhaps through some official policy, the requirement of adequate notice does not apply. *Davis*, 526 U.S. at 641–42 (noting that the "requirement that funding recipients have notice of their potential liability . . . does not bar a private damages action under Title IX where the funding recipient engages in intentional conduct that violates the clear terms of the statute."); *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290 (1998) (requiring "actual knowledge" of sexual harassment only "in cases like this one [i.e., a teacher harassment case] that do not involve [a school's] official policy."). On this basis, the Tenth Circuit has held—facing evidence of sexual assaults in a university program to show football recruits a "good time"—that "a funding recipient can be said to have 'intentionally acted in clear violation of Title IX,' when the violation is caused by official policy, which may be a policy of deliberate indifference to providing adequate training or guidance . . . obviously necessary for . . . a specific program or

policy." *Simpson v. Univ. of Colorado Boulder*, 500 F.3d 1170, 1178 (10th Cir. 2007) (quoting *Davis,* 526 U.S. at 642). The Eleventh Circuit reached a similar conclusion in a rape case, where a university recruited the perpetrator despite his known history of sexual assault and failed to take any precautionary measures. *Williams v. Bd. of Regents of Univ. Sys. of Georgia*, 477 F.3d 1282, 1295–96 (11th Cir. 2007).

But this case has very different facts from *Simpson* and *Williams*, and Ms. Raihan has not provided enough information to plausibly allege that the University intentionally violated Title IX. There are no comparable specific allegations of official school conduct.

The Complaint's perhaps most damning allegation, viewed in the light most favorable to Ms. Raihan, is that the University agreed to adopt a policy specific to sexual assault in response to federal investigation, and then failed to apply that policy in practice, either through the existing adjudication system or its understaffed Title IX program. But "the failure to promulgate a grievance procedure does not itself constitute 'discrimination' under Title IX," and neither does non-compliance with federal regulations. *Gebser*, 524 U.S. at 292.[2] Even factoring in the University's 2014 survey, which put the University on notice that many students were unsatisfied with its approach to sexual misconduct, there is still no credible allegation that the University *intended* to create impunity for sexual harassment or assault.[3] Instead, Ms. Raihan has only

---

[2] The Court will not rely on the University's alleged non-compliance with the guidance document known as a "Dear Colleague Letter" issued by the Department of Education in 2011. *See* Compl. ¶¶ 20, 79. The Department rescinded this document after it was widely criticized, *see North v. Catholic Univ. of Am.*, 310 F. Supp. 3d 89, 92 n.2 (D.D.C. 2018), and in any event, a university's failure to follow even well-grounded guidance from the Department is not alone sufficient to establish deliberate indifference to a known act of harassment. *Cavalier v. Catholic Univ. of Am.*, 306 F. Supp. 3d 9, 16 (D.D.C. 2018).

[3] Ms. Raihan's allegation that "Plaintiff reported that Favorito raped, or attempted to rape three other GW female students," Compl. ¶ 69, is not entitled to any weight. First, these actions and

plausibly alleged negligence, not intent.  And the Supreme Court has repeatedly declined to "impose [Title IX] liability under what amount[s] to a negligence standard."  *Davis*, 526 U.S. at 642.  After all, the standard cannot "mean that recipients can avoid liability only by purging their schools of actionable peer harassment."  *Id*. at 648.

The cases applying the Supreme Court's "official policy" logic confirm this conclusion.  Despite Ms. Raihan's arguments to the contrary, the leading cases have focused on existing knowledge of specific prior sexual assaults.  *See Simpson*, 500 F.3d at 1180-1185 (detailing evidence that made the risk of sexual assault "obvious" in the University of Colorado's football recruiting program, including the prior sexual assault of a high school student); *Williams*, 477 F.3d at 1295–96 ("importantly, [plaintiff] alleges that [university officials who recruited the perpetrator] knew about [his] past sexual misconduct").  Ms. Raihan relies heavily on the Ninth Circuit's decision in *Mansourian v. Regents of Univ. of Cal.*, which held that notice requirements do not apply to Title IX cases alleging sex-discriminatory athletic funding, since funding decisions are "by definition—intentional."  602 F.3d 957, 968 (9th Cir. 2010).  But *Mansourian* was not a sexual harassment case.  And the Ninth Circuit explicitly recognized that those cases are different.  *Id.*

Ms. Raihan also relies on two out-of-circuit district court opinions, but they do not save her.  First, she looks to *Tubbs v. Stony Brook Univ.*, which held that "knowledge of an increase in sexual assaults on campus, combined with notice that [] policies and responses to sexual assaults are deficient and a subsequent failure to remedy the deficiencies" could satisfy basic pleading

---

Ms. Raihan's reports of them to the University occurred after her own assault.  They cannot therefore support a claim about the University's prior indifference.  Second, these allegations are conclusory and threadbare and so are "not entitled to the assumption of truth."  *See Iqbal*, 556 U.S. at 679.

11

standards. 2016 WL 8650463, at *9 (S.D.N.Y. Mar. 4, 2016). But *Tubbs* also concluded, relying on *Simpson*, that "in order for a university to violate Title IX through a policy of deliberate indifference, it must have actual knowledge of a heightened risk that is specific enough to allow it to remedy such a policy." *Id*. at *8. Ms. Raihan's complaint does not provide well-pleaded facts that would permit a plausible inference that the University had that knowledge here. *See* Compl. ¶¶ 78-85. Generalized claims of bad sexual misconduct policy—with the only specific incident coming in the form of Ms. Raihan's own case—would not satisfy even *Tubbs*' standard.

Second, Ms. Raihan relies on *Doe 1 v. Baylor Univ.*, which allowed another "heightened-risk" claim to survive a motion to dismiss. 240 F. Supp. 3d 646, 661 (W.D. Tex. 2017). But *Doe I* is best understood as an actual knowledge case, as the plaintiffs explicitly based their claims on Baylor University's actual knowledge of sexual assaults and alleged failure to respond. *Id*. In any event, *Doe I* involved ten detailed accounts of systemic university failures in responding to peer sexual assault across more than a decade. *Id.* at 653-56. Many of the victim plaintiffs quickly reported the assaults to university authorities within days or weeks, only to have school officials consistently provide misinformation, discourage further reporting, decline to take appropriate investigatory or protective action, and fail to hold alleged perpetrators accountable. *Id*. Not so here.

Without specific evidence beyond the University's failure to implement fully its own policy, and its conduct in Ms. Raihan's case, this case amounts to one of alleged official negligence, not intent. That is insufficient for Title IX liability. *Davis*, 526 U.S. at 642. Ms. Raihan has not plausibly asserted that official University policy was responsible for her assault.

## B. Ms. Raihan's Post-Assault Claim Fails

Ms. Raihan also claims that the University's response to her assault constitutes deliberate indifference. Compl. ¶¶ 86-92. She says that the University "received actual notice of the sexual assault" by October 3, 2016, over two and a half years after the incident, *id.* ¶ 87, and that the failure to "provide a prompt and equitable resolution" or to follow University policy and federal guidance was clearly unreasonable. *Id.* ¶¶ 89-90. This, she claims, "exposed her to the risk of continued sexual harassment . . . so severe, pervasive, and objectively offensive that it effectively barred her access to educational opportunities and benefits including academics, and on campus events and activities." *Id.* ¶ 91.

It is far from clear that Ms. Raihan has adequately alleged that the University acted with deliberate indifference. In *Cavalier*, Judge Moss found that the plaintiff "alleged enough—although just enough—to clear the motion to dismiss hurdle," when she claimed that Catholic University took 298 days after her report to ultimately decide not to hold her alleged assailant accountable. 306 F. Supp. 3d at 28, 31. And she—unlike Ms. Raihan—reported the assault hours after it occurred. *Id.* at 18.

In that case, the plaintiff identified "a litany of University actions, and failures to act," including (1) that it took too long to complete the various portions of the investigation, which was shoddy in any event; (2) the investigation and disciplinary hearing were biased in favor of her alleged assailant, including through preventing her from calling an important witness at the hearing; (3) that her allegations were treated with hostility by the investigator; and (4) that the University dragged its feet in implementing a supposedly-automatic no-contact order and then failed to enforce it despite her reporting on at least six occasions that her assailant repeatedly—indeed, often weekly—violated the no-contact order by intentionally harassing her. *Id.* at 26-27,

13

33. To be sure, the school in that case found insufficient evidence of wrongdoing by the alleged assailant, while here the University sustained Ms. Raihan's complaint but imposed what she sees as a meaningless punishment. But *Davis* teaches that "courts should refrain from second-guessing the disciplinary decisions made by school administrators." 526 U.S. at 648. In any event, if the *Cavalier* complaint barely cleared the Rule 12 bar for deliberate indifference, it is hard to see how Ms. Raihan's complaint makes out deliberate indifference.

Even assuming the University's response to Ms. Raihan's sexual assault was clearly unreasonable and thus constituted deliberate indifference, the *Davis* standard's second prong remains unquestionably unsatisfied. A damages action "will lie only for harassment that is so severe, pervasive, and objectively offensive that it effectively bars the victim's access to an educational opportunity or benefit." *Id*. at 633. True, Ms. Raihan recites this language, Compl. ¶ 91, but "[t]hreadbare recitals of the elements of a cause of action . . . do not suffice." *Iqbal*, 556 U.S. at 678. So the Court gives no weight to Ms. Raihan's legal conclusion that she was "constantly exposed to a sexually hostile environment," Compl. ¶ 71, or that the "the risk of continued sexual harassment . . . effectively barred her access to educational opportunities," *id*. ¶ 91. *Iqbal*, 556 U.S. at 679 ("a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth.").

Working only with Ms. Raihan's well-pleaded allegations, the Court assumes the truth of her claim that Mr. Favorito never received a no-contact order, Compl. ¶ 41, and that Ms. Raihan encountered him at the campus gym, where he worked as a manager. *Id*. ¶ 72. Ms. Raihan says that this encounter "effectively denied [her] access to the school gym," *id*., using the language of *Davis*. The Court credits this conclusion to a limited extent: Ms. Raihan has plausibly alleged

that Mr. Favorito's employment at the campus gym made her too uncomfortable to return there. *See* Opp. 12 ("she took it upon herself to avoid the gym."). But even this allegation does not satisfy the standard.

*Davis* emphasized that the harassment which denies educational access must be "severe, pervasive, and objectively offensive," and that isolated incidents are unlikely to create the "systemic effect" necessary to trigger liability. 526 U.S. 652-53. On the facts before it, the *Davis* Court found that the plaintiff had stated a claim, and noted the plaintiff's falling grades, and the "persistence and severity" of the harassment she faced. *Id*. at 652. As an "obvious example" of harassment that would satisfy the standard, the Court said:

> Consider . . . a case in which male students *physically threaten* their female peers *every day*, successfully preventing the female students from using a particular school resource—an athletic field or a computer lab, for instance. District administrators are well aware of the daily ritual, yet they deliberately ignore requests for aid from the female students wishing to use the resource. The district's knowing refusal to take any action in response to such behavior would fly in the face of Title IX's core principles, and such deliberate indifference may appropriately be subject to claims for monetary damages.

*Id*. at 650–51 (emphasis added).

The University's actions here permitted nothing close to the level of harassment that *Davis* contemplated. Well over two years after the alleged assault and weeks before her graduation, Ms. Raihan saw Mr. Favorito once and reports nothing particularly notable about the encounter. Compl. ¶ 72. Mr. Favorito was in a public gym, removed in time and space from the alcohol-infused, unaccountable context of the dorm room in which the assault occurred. *Id*. The contact here is a far cry from the flagrant no-contact violations alleged in *Cavalier*, which began shortly after the alleged assault, occurred twice weekly at times, and sometimes involved her assailant and his friends calling her sexually-derogatory slurs. 306 F. Supp. 3d at 33-34. After

the gym encounter, Ms. Raihan complained and unspecified restrictions were placed upon Mr. Favorito, which she claims he violated, although not apparently through any actions toward her. Compl. ¶¶ 62-63.

Sexual assault victims endure enormous pain, and the Court does not downplay the impact that seeing Mr. Favorito may have had on Ms. Raihan. Even so, this complaint does not plausibly allege that the University's failures caused Ms. Raihan to experience "severe, pervasive, and objectively offensive" harassment. *Davis*, 526 U.S. at 633.

Here, the timeline of the events also weighs against Ms. Raihan. Even though the alleged assault occurred in her freshman year, March 2014, Ms. Raihan did not file a complaint until the fall of her senior year, October 2016. While there are many valid reasons one may delay reporting a sexual assault, Ms. Raihan makes no allegation of harassment by Mr. Favorito or limitation on her educational opportunities during the intervening two and a half years.

Although she does not pin-point the date of the gym encounter, it apparently happened "[a]fter the adjudication of her report," *i.e.,* March 2017. Compl. ¶¶ 54, 72. She graduated two months later. *Id.* ¶ 74. Given the apparently uneventful years between the alleged assault and this encounter, the lack of any allegations of misconduct during the gym encounter, and the fact that the University did restrict Mr. Favorito's activities at the gym thereafter, the Court cannot say that Ms. Raihan's self-imposed exile from the University gym for a matter of weeks before her graduation "effectively denied [her] equal access to [the University's] resources and opportunities." *Davis*, 526 U.S. at 651; *see also id.* at 652 (denying that "an overweight child who skips gym class because the other children tease her about her size" would make out an actionable claim).

16

Ms. Raihan's counter-argument is that *Davis* defined the statutory term at issue—"subjected to discrimination," 20 U.S.C. § 1681—to include not only actual harassment, but making students "liable or vulnerable to it." *Id*. at 645; Opp. 12. As she would put it, the University's failure to effectively sanction Mr. Favorito or take interim protective measures left her vulnerable to further harassment, particularly at the campus gym. But the claim still fails. *Davis* itself provides the answer:

> [T]he [statutory] provision that the discrimination occur 'under any education program or activity' suggests that the behavior be serious enough to have the systemic effect of denying the victim equal access to an educational program or activity. Although, in theory, a single instance of sufficiently severe one-on-one peer harassment could be said to have such an effect, we think it unlikely that Congress would have thought such behavior sufficient to rise to this level in light of the inevitability of student misconduct and the amount of litigation that would be invited by entertaining claims of official indifference to a single instance of one-on-one peer harassment.

526 U.S. at 652–53.

Under *Davis*, a single instance of sexual assault cannot suffice for Title IX liability without evidence of a systematic effect on equal access. And the university context is relevant here, since "[a] university might not . . . be expected to exercise the same degree of control over its students that a grade school would enjoy." *Id*. at 649.

What happened to Ms. Raihan was tragic. But since she reported the incident months before graduation, the University had only a limited window in which to respond, and only a single, uneventful encounter with Mr. Favorito occurred after the University reached its decision. Seeing one's abuser in a campus gym is not "pervasive" harassment or a "systemic" denial of educational benefits. *See id*. at 633, 652. This claim therefore fails to allege the injury that Title IX liability requires.

## C. Ms. Raihan's Negligent Retention Claim Fails

The Complaint's final claim is that the University "negligently retained" Director Slifka, who orchestrated Mr. Favorito's deferred suspension. Compl. ¶¶ 61, 99-100. To make out a negligent retention claim under District of Columbia tort law, a plaintiff must show "that the employer breached a duty to plaintiff to use reasonable care in the supervision or retention of an employee which proximately caused harm to plaintiff." *Phelan v. City of Mount Rainier*, 805 A.2d 930, 940 (D.C. 2002). "To invoke this theory of liability it is incumbent upon a party to show that an employer knew or should have known its employee behaved in a dangerous or otherwise incompetent manner, and that the employer, armed with that actual or constructive knowledge, failed to adequately supervise the employee." *Brown v. Argenbright Sec., Inc.*, 782 A.2d 752, 760 (D.C. 2001).

Ms. Raihan alleges that Director Slifka's failure "to investigate and address" what happened to her amounted to "callous disregard," causing her harm. *Id*. ¶ 96. She claims that the University failed to protect her, perhaps by making sure Director Slifka followed its policy. *Id*. ¶¶ 99-100. The University was allegedly on notice that Director Slifka was dangerous to victims, since unidentified "other sexual harassment victims" had been harmed by him and told the University. *Id*. ¶ 98. Presumably, Ms. Raihan thinks the University proximately caused her injuries by failing to fire or at least adequately supervise Director Slifka. *Id*. ¶¶ 99-100.

But this claim fails for two reasons. First, Ms. Raihan has offered no well-pleaded facts to warrant the inference that the University had "actual or constructive knowledge" of any prior misbehavior from Director Slifka. *See Brown*, 782 A.2d at 760. The unadorned claim that "[u]pon information and belief, Mr. Slifka had previously caused harm to other sexual

harassment victims" who told the University, Compl. ¶¶ 97-98, will not suffice. *See Iqbal*, 556 U.S. at 678.

Second, as the University points out, under District of Columbia law "a common law claim of negligent supervision may be predicated only on common law causes of action or duties otherwise imposed by the common law," not on duties imposed by statute. *Griffin v. Acacia Life Ins. Co.*, 925 A.2d 564, 576 (D.C. 2007). The common law duties of an employer do not extend to preventing all sexual harassment by employees, but only the harassment that takes the form of an independent tort, "such as, for example, assault and battery or intentional infliction of emotional distress." *Id*. at 576 & n. 31.

Here, Ms. Raihan's negligent retention suit is not based on Mr. Favorito's assault, which would constitute a tort, but on Director Slifka's response. She does not allege that Director Slifka committed a classic tort against her, or even that he allowed Mr. Favorito to do so, but only that his failure "to investigate and address" the assault amounted to "callous disregard," causing her harm. Compl. ¶ 96. The University's common law duties as an employer—distinct from any obligations imposed by Title IX—do not extend to preventing Mr. Slifka from causing such injuries. *Griffin*, 925 A.2d at 576 & n. 31.

Ms. Raihan's counter-argument is that where "an employee's conduct forms the basis for a statutory claim and is also actionable at common law, the plaintiff may bring both a statutory claim and a negligent supervision claim." Opp. 14 (quoting *Beyene v. Hilton Hotels Corp.*, 815 F. Supp. 2d 235, 252 n. 21 (D.D.C. 2011), *aff'd*, 573 F. App'x 1 (D.C. Cir. 2014)). The University's common law duties extend to what happened here, she argues. Opp. 14-15. While Ms. Raihan is correct that actionable statutory and common law claims can rest on the same facts, it does not follow that common law duties of an employer extend to her allegations against

19

Mr. Slifka. In fact, District of Columbia law forecloses this conclusion. *Griffin*, 925 A.2d at 576 & n. 31; *Beyene*, 815 F. Supp. 2d at 252 n.21 ("the defendant in *Griffin* could not be held liable for negligently supervising an employee who sexually harassed another employee because there was no duty at common law to prevent sexual harassment of employees"). Because the Complaint fails to state a claim of negligent supervision, that count must be dismissed as well.

## IV. CONCLUSION

For these reasons, the Court will grant the Defendant's Motion to Dismiss. A separate order will issue.

Dated: August 28, 2018								TREVOR N. MCFADDEN, U.S.D.J.